KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
 rkendall@kbkfirm.com
Philip M. Kelly (212714)
 pkelly@kbkfirm.com
Ashlee R. Lynn (261002)
 alynn@kbkfirm.com
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

Attorneys for Plaintiff-in-Interpleader
HACHETTE BOOK GROUP, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., a Delaware Corporation,<br><br>    Plaintiff-in-Interpleader,<br><br>v.<br><br>WINDBLOWN MEDIA, INC., a California Corporation; WAYNE JACOBSEN; BRAD CUMMINGS; WILLIAM PAUL YOUNG,<br><br>    Defendants-in-Interpleader. | Case No. CV10-03534 JFW (JCx)<br><br>**FIRST AMENDED COMPLAINT-IN-INTERPLEADER**<br><br>(Filed concurrently with Notice of Deposit of Funds into Court Registry and [Proposed] Order Directing Deposit of Funds into Court Registry) |

Plaintiff-in-Interpleader, Hachette Book Group, Inc. ("Hachette"), alleges as follows:

## SUMMARY OF FIRST AMENDED COMPLAINT-IN-INTERPLEADER

1. Hachette is the distributor of a literary work entitled *The Shack* (hereinafter the "Book"). The publisher of the Book is Defendant-in-Interpleader Windblown Media, Inc. ("Windblown"), which was formed by Defendants-in-Interpleader Wayne Jacobsen ("Jacobsen") and Brad Cummings ("Cummings").

FIRST AMENDED COMPLAINT-IN-INTERPLEADER

The listed author of the Book is Defendant-in-Interpleader William Paul Young ("Young"). As described more fully below, Hachette is holding certain funds from sales of the Book in the first quarter of 2010 that are to be distributed to Windblown, Jacobsen, Cummings, and Young. As a result of disputes that have arisen concerning the allocation of royalties and certain other proceeds from the sales of the Book, Hachette requires the guidance of this Court to determine how much of these funds should be paid to Windblown and how much should be paid to Jacobsen, Cummings, and Young.

2. The disputes between Windblown, Jacobsen, Cummings, and Young first arose several years after Young developed a manuscript for a Christian-based novel. Windblown alleges that Young sent Jacobsen a copy of the manuscript in December 2005 and solicited Jacobsen's and Cummings's help in rewriting the manuscript. Windblown alleges that Young, Jacobsen, and Cummings collaborated to transform Young's manuscript into the Book. Unsatisfied with the credit received for their efforts, Cummings and Jacobsen filed an action against Young in the United States District Court for the Central District of California, Case No. CV10-3246-JFW (JCX) (hereinafter, the "Federal Court Action"), which seeks, among other things, a determination that Jacobsen and Cummings are co-authors of, and therefore have various economic rights in, the Book.

3. Jacobsen, Cummings, and Young also dispute in the Federal Court Action (as well as in a state court action, as discussed below) the interpretation of certain oral and written agreements among them and Windblown that bear on the allocation of proceeds from Hachette's sales of the Book. Jacobsen and Cummings allege that they formed Windblown in 2007 to publish the Book, as well as works by Jacobsen and other authors, pursuant to an oral agreement with Young for Windblown to publish the Book. They allege that after demand for the Book took off, Windblown and Young jointly decided to pursue an arrangement with a well-known publishing house to provide large-scale distribution of the Book in order to

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

significantly increase sales. Prior to entering into such an agreement, Windblown and Young agreed to commit their oral agreement to writing. Windblown and Young therefore entered into a written agreement on May 10, 2008 (the "Windblown-Young Agreement"). Numerous disputes have arisen among Young, Jacobsen, Cummings, and Windblown concerning the parties' financial rights and obligations arising from the Windblown-Young Agreement.

4.  In furtherance of the objective of securing the services of a major publishing house to provide large-scale distribution of the Book and after negotiations with several publishers, Windblown subsequently entered into a written agreement on May 13, 2008 with Hachette, pursuant to which Hachette agreed to manufacture, distribute, market, and provide other related services for the Book (the "Hachette-Windblown Agreement."). The Book has become hugely successful, selling over eight million copies.

5.  Under the Hachette-Windblown Agreement, Hachette is obligated to send certain "author royalty" payments to Young, Jacobsen, and Cummings in accordance with the information provided by Windblown. Hachette is also obligated to send payments to Windblown of certain "Defined Proceeds" based on revenues generated by Hachette from the Book, net of the author royalty payments and certain deductible expenses incurred by Hachette. Hachette is currently in possession of $990,182.35, which constitutes Defined Proceeds for the quarter ending March 31, 2010 (hereinafter, the "Funds"). Windblown, Jacobsen, Cummings, and Young all have asserted competing claims to the Funds, as more fully described below.

6.  Young alleges that he is entitled to a significantly larger portion of Defined Proceeds and author royalties from Windblown than he has been paid to date. Although Young has not yet responded to the Complaint in the Federal Action, Young has filed an action in Ventura County Superior Court, Case No. 56-2009-00362329-CU-BC-VTA (hereinafter, the "State Court Action"), against both

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

3

FIRST AMENDED COMPLAINT-IN-INTERPLEADER

Windblown and Hachette alleging, among other things, that he has not been paid a proper share of the Defined Proceeds and author royalties received by Windblown in prior time periods. Young has asserted that he has the right to demand that Hachette pay him the larger portion of Defined Proceeds and author royalties to which he claims he is entitled. Windblown disagrees with Young and asserts that Young's claims are overstated and contrary to the Windblown-Young Agreement. Hachette disagrees with Young as to certain of his claims, but takes no position as to at least one of Young's other claims.

7. In light of the adverse claims to the Defined Proceeds, Hachette has a reasonable fear that distributing the Defined Proceeds would expose Hachette to multiple claims and liabilities from Windblown, Jacobsen, Cummings, and Young. As a result, Hachette has brought this interpleader action so that the Court can determine the proper allocation of the Funds as between Windblown, Jacobsen, Cummings, and Young, and determine Hachette's responsibilities with respect to such allocation and other allocations of Defined Proceeds and author royalty payments that are or may become the subject of disputes among the parties.

## THE PARTIES

8. Plaintiff-in-Interpleader Hachette is a Delaware corporation with its principal place of business in New York City, New York.

9. Defendant-in-Interpleader Windblown is a corporation incorporated under the laws of the state of California, with its principal place of business located in Newbury Park, Ventura County, California.

10. Defendant-in-Interpleader Jacobsen is an individual residing in Newbury Park, Ventura County, California.

11. Defendant-in-Interpleader Cummings is an individual residing in Newbury Park, Ventura Country, California.

12. Defendant-in-Interpleader Young is an individual residing in Oregon City, Oregon.

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

4
FIRST AMENDED COMPLAINT-IN-INTERPLEADER

## JURISDICTION AND VENUE

13. The Court has original subject matter jurisdiction over this First Amended Complaint-in-Interpleader pursuant to 28 U.S.C. § 1335 in that diversity of citizenship exists between two adverse claimants, as set forth above, and the amount in controversy exceeds $500, exclusive of interest.

14. In addition to the foregoing, this interpleader action is appropriate under Rule 22 of the Federal Rules of Civil Procedure. To the extent this First Amended Complaint-in- Interpleader is brought pursuant to Rule 22, subject matter jurisdiction exists pursuant under 28 U.S.C. § 1332 (Diversity Jurisdiction) in that the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs, and is between citizens of different states.

15. Venue is proper pursuant to 28 U.S.C. §§ 1391(a) and 1397 in that the action is being brought in a judicial district in which one or more of the Defendants-in-Interpleader resides and the Defendants-in-Interpleader are subject to personal jurisdiction in this judicial district.

## GENERAL ALLEGATIONS

16. Windblown alleges that after the Book was completed and Young, Jacobsen, and Cummings were unable to find a publisher, Windblown and Young entered into an oral publishing agreement in or around 2007 by which they agreed that Windblown would publish the Book. Under the terms of this oral agreement, Windblown alleges that Young would receive a $.50 per paperback/$1.00 per hardback royalty for each copy of the Book sold. Windblown would set aside fifty percent of the revenue received in connection with the Book for profits to be shared equally among the Book's co-authors, with Young, Jacobsen, and Cummings each receiving one-third of those profits. The remaining fifty percent of the revenue received from the exploitation of the Book was set aside for Windblown's operating capital.

5
FIRST AMENDED COMPLAINT-IN-INTERPLEADER

17. Windblown alleges that as Windblown's sales of the Book approached one million copies, Young, Jacobsen, and Cummings agreed that Windblown should seek a larger publishing house with the ability to provide fulfillment and related services to meet the overwhelming demand for the Book. It was as a result of this decision that Windblown came into contact with Hachette, one of the nation's top book publishers and distributors. Windblown alleges that Young was actively involved in and approved Windblown's decision to enter into a contract with Hachette to provide fulfillment services for the Book, realizing that they would all be surrendering up to one-half of the profits from the book to Hachette as the publisher. Windblown alleges that Cummings and Young discussed at length the fact that if Windblown were to contract with Hachette, Young, Jacobsen and Cummings would each receive one-sixth rather than one-third of the profits from the Book, with the upside being that there would be a higher volume of sales and the Book would reach a much larger audience.

18. Young, Jacobsen, and Cummings agreed that before entering into an agreement with a third party fulfillment service provider, Windblown and Young would enter into a written publishing agreement.

19. Windblown alleges that Young, on the one hand, and Jacobsen on behalf of Windblown, on the other hand, negotiated and jointly drafted the Windblown-Young Agreement dated May 10, 2008. The Windblown-Young Agreement provides that Young would receive an author royalty of $.50 per paperback/$1.00 per hardback for each copy of the Book sold in the United States, along with one-third of the net profits received by Windblown from Hachette's sales of the Book. For foreign sales of the Book and certain other products, the author royalty rate is divided such that Young would receive 60%, Jacobsen would receive 20%, and Cummings would receive 20%. For copies sold at a discount of 55% or greater off the retail price, premiums (defined as promotional items not for individual resale), and copies sold as a result of Windblown's direct marketing

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

programs, the Windblown-Young Agreement provides for author royalties of 10% of net sales revenue for hardcover and 5% for all other editions. Finally, Windblown acquired the merchandising rights to the Book, and Young is to receive a royalty of 10% of the net sales revenue received by Windblown in connection with such merchandising.

20. Hachette was not a party to the Windblown-Young Agreement and was not a participant in the negotiations between Windblown and Young concerning its terms and conditions.

21. On May 13, 2008, Windblown entered into the Hachette-Windblown Agreement. The Hachette-Windblown Agreement provides that Windblown will supply all information necessary for Hachette to compute author royalties arising out of Hachette's sales and licenses under said agreement. The Hachette-Windblown Agreement further provides that Hachette is responsible for reporting and sending certain author royalty payments directly to Young, Jacobsen, and Cummings and reporting to Windblown the amounts due with respect to such author royalty payments, all in accordance with information provided by Windblown.

22. The Hachette-Windblown Agreement requires that Hachette prepare a quarterly "Statement" for the Book setting forth the "Net Copies" of the Book (the number of copies shipped by Hachette minus actual and estimated returns) and specified "Defined Proceeds." "Defined Proceeds" for the Book are determined by calculating all Revenues received by Hachette minus all "Expenses" incurred by Hachette. "Revenues" are defined as all monies received by Hachette from sales or licenses of the Book minus actual returns and a reasonable reserve against future returns, as well as any other monies actually received by Hachette relating directly to the Book. "Expenses" are defined as certain enumerated out-of-pocket expenses incurred by Hachette, including author royalty payments to Young, Jacobsen, and Cummings and Hachette's general distribution services fee (equal to 10% of net sales).

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

7
FIRST AMENDED COMPLAINT-IN-INTERPLEADER

23. If the quarterly Statement reveals a positive balance, the Hachette-Windblown agreement provides that the Defined Proceeds should be divided in the following manner with respect to the Book: Windblown receives 65% of the Defined Proceeds from the first million Net Copies, 60% of the next two million Net Copies, and 50% of all Net Copies thereafter, and Hachette receives the remainder of such Defined Proceeds.

24. Windblown then allocates the Defined Proceeds it receives under the Hachette-Windblown Agreement in accordance with the Windblown-Young Agreement, which requires Windblown to pay Young one-third of the net profits generated by the book for Windblown. Upon information and belief, Jacobsen and Cummings also receive a share of each Defined Proceeds payment.

25. Once the Hachette-Windblown Agreement was in place, Hachette took over primary distribution of the Book around June 2008. The Book became a phenomenal commercial success, and by December 2008, over six million copies had been sold worldwide.

26. Following the extraordinary success of the Book, Young hired an accounting firm to audit Windblown's books and records. Since completing his audit, Young has asserted claims in the State Court Action against Windblown and Hachette that, among other things, he has not been paid a proper share of the Defined Proceeds for prior time periods and has argued that Hachette is equally responsible for these allegedly insufficient payments. Young has alleged that Windblown and Hachette have failed to pay Young an appropriate amount of the Defined Proceeds received by Windblown in at least the following respects:

(a) Windblown improperly characterized a majority of its sales as "high discount sales" in order to pay Young only the 5% or 10% royalty in lieu of a one-third profit share and $.50 per paperback/$1.00 per hardback book royalty. Young alleges that this accounting inequity deprived him of his share of the profit on 75% of the sales Windblown generated in the United States and approximately 27% of

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

the sales Hachette generated in the United States. Young contends that the "high discount sales" exception in the Windblown-Young Agreement was never intended to cover such a large portion of the book's sales and has resulted in more of the Defined Proceeds being retained by Windblown, Jacobsen, and Cummings than is proper;

(b) Windblown improperly deducted the fixed $.50 per paperback/$1.00 per hardback book royalty for each copy of the Book before calculating Young's share of net profits, and making this deduction decreased the amount of money subject to the one-third profit share. Young contends that the Windblown-Young Agreement entitles him to the $.50 per paperback/$1.00 per hardback book royalty *plus* one-third of the net profits from its distribution; and

(c) Windblown improperly collected a 10% distribution fee off-the-top before calculating Young's share of net profits. Young alleges that no provision of the Windblown-Young Agreement allows Windblown to collect a distribution fee, and the costs of distribution are separately accounted for in the accountings provided by Windblown. Young alleges that Windblown's collection of this distribution fee deprives him of his rightful share of Windblown's net profits.

27. Windblown, Jacobsen, and Cummings disagree with the foregoing contentions and assert that they have paid Young properly pursuant to the Windblown-Young agreement.

28. Hachette is currently in possession of $990,182.35 in Funds, which consist of Defined Proceeds under the Hachette-Windblown Agreement for the quarter ending March 31, 2010. The Funds are to be allocated in some manner between Windblown, Jacobsen, Cummings, and Young.

29. Windblown, Jacobsen, and Cummings assert that they are entitled to the full amount of the Defined Proceeds owed under the Hachette-Windblown Agreement, less an amount consistent with how Young has been paid by Windblown to date. Young asserts that he is entitled to a greater share of the

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Defined Proceeds than he has received to date, and his resulting action against Windblown and Hachette makes clear that there is a genuine dispute as to what would constitute a proper division of the Funds. As a result, Windblown, Jacobsen, Cummings, and Young have conflicting claims to the same Funds.

30. In light of these adverse claims to the Funds, Hachette has a real and reasonable fear that distributing the Funds would expose Hachette to multiple claims and liabilities. Hachette has a reasonable fear that if it distributes the Funds to Windblown as it has done in the past, Young is likely to assert an additional claim against Hachette that Windblown has paid him an insufficient amount of the Funds. Similarly, if Hachette pays the portion of the Funds demanded by Young to Young, Windblown, Jacobsen, and Cummings are likely to assert a claim against Hachette for some or all of the Funds. Hachette further expects that similar disputes among Young, Windblown, Jacobsen, and Cummings are likely to arise in the future.

## FIRST CLAIM FOR RELIEF

### (Interpleader)

31. Hachette realleges Paragraph 1 through 30, inclusive, as if set forth fully herein.

32. Concurrent with the filing of this First Amended Complaint-in-Interpleader, Hachette is depositing with the Clerk of this Court, there to remain until the outcome of this action, a check of $990,182.35 in Funds, representing the amount of Defined Proceeds payable to Windblown, and through Windblown to Young, for the quarter ending March 31, 2010.

33. Because of the competing claims set forth above, Hachette is unable to determine the proper payment of the Funds owed and faces the real and reasonable possibility of multiple liabilities if the Funds are distributed without Court direction.

34. Hachette files this interpleader action in good faith and without collusion with any of the parties hereto.

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

10
FIRST AMENDED COMPLAINT-IN-INTERPLEADER

35. Hachette claims no interest in the above-referenced Funds and is a mere stakeholder in this action.

36. Because of the competing claims to the Funds, Hachette was required to file this action to protect itself from multiple liabilities, and it has incurred and will continue to incur attorneys' fees and costs in connection with this action.

## PRAYER FOR RELIEF

**WHEREFORE**; - Hachette prays as follows:

1. For the Funds to be deposited in an interest-bearing account in accordance with the concurrently filed Notice of Deposit of Funds into Court Registry and [Proposed] Order Directing Deposit of Funds into Court Registry;

2. For this Court to determine how the Funds, as well as any future Defined Proceeds owed under the Hachette-Windblown Agreement, are to be distributed as between the Defendants-in-Interpleader;

3. For Defendants-in-Interpleader and each of them, their agents, attorneys or assigns, to be enjoined and restrained temporarily, and upon a full hearing, that the injunction be made perpetual, restraining each of them, their agents, attorneys or assigns, from instituting any suit at law or equity, or action of any kind whatsoever, against Hachette with respect to the payment of the Funds or any future Defined Proceeds deposited;

4. That upon deposit of the Funds, and any deposits of future Defined Proceeds, following the filing of this First Amended Complaint-in-Interpleader, and upon service of the Defendants-in-Interpleader herein, that Hachette be discharged of all liability with respect to the payment or distribution of the Funds and any future Defined Proceeds deposited;

5. For Hachette to be awarded its costs and reasonable attorneys' fees in conjunction with this action to be paid from the amount in dispute deposited; and

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

6.   For such other and further relief as the Court deems reasonable and just under the circumstances.

Dated: June 3, 2010         KENDALL BRILL & KLIEGER LLP

By: _____
Philip M. Kelly
Attorneys for Plaintiff-in-Interpleader
HACHETTE BOOK GROUP, INC.

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

12

FIRST AMENDED COMPLAINT-IN-INTERPLEADER